# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BJORN MYKLATUN, an individual residing in Oslo, Norway, and OIL INNOVATION, AS, a Norwegian Company,<br><br>    Plaintiffs,<br><br>-vs-<br><br>HALLIBURTON ENERGY SERVICES, INC., a Foreign Corporation, FLOTEK INDUSTRIES, INC., a Delaware Corporation, CHEMICAL AND EQUIPMENT SPECIALTIES, INC., an Oklahoma corporation, JERRY D. DUMAS, SR., an individual residing in Houston, Texas, and JOHN TODD SANNER, an individual residing in Duncan, Oklahoma,<br><br>    Defendants. | Case No. CIV-09-770-F |

## **MEMORANDUM**

  By order entered on October 14, 2011, the court granted the defendants' motion in limine, as to point no. 9, excluding Mr. Myklatun's proposed testimony as to lost profits. By this memorandum, the court states the reasons for that determination. As will be seen, the court's determination resulted from a combination of substantive and procedural considerations.

The assertion of a claim for damages measured by lost profits will invariably provide fair ground for litigation. That litigation will commonly take the form of Daubert challenges (as has occurred in this case), motions under Rule 56, and thorough discovery, undertaken both as a platform for pretrial motions and in preparation for trial – by way of challenging the claimant's case and building a defense to the lost profits claim through expert testimony and otherwise.

At the risk of oversimplification, it can be said for discussion purposes that lost profit claims have three components: (i) the underlying factual premises, typically consisting of historical financial data (if there is any), as well as financial and market-related projections and assumptions (ii) the analysis of that data, which necessarily includes the selection of a legally and financially defensible analytical approach, and (iii) the quantitative conclusion, which will, in turn, be fair game for testing against the real world historical experience of the claimant's enterprise or similar enterprises. The mere description of these three building blocks of a lost profits claim makes it obvious that a lost profits claim – let alone one that, as in this case, starts at $25 million and goes up from there – cannot be fairly litigated unless the opposing party has had full opportunity to contest the factual basis, the analysis, and the conclusions using the tools that are available in civil litigation in this court. That process starts with full disclosure[1] by the claiming party; any significant failure to disclose will present a serious risk of prejudice to the opposing party.

---

[1] Any doubt as to whether the assertion of a claim for lost profits gives rise to a need for full disclosure, and a full opportunity to litigate the claim, will be removed by a reading of the district court procedural history in <u>LifeWise Master Funding v. Telebank</u>, 374 F.3d 917, 921 - 23 (10th Cir. 2004).

At the hearing on the parties' Daubert motions, held on September 26, 2011, the court granted defendants' motion as to the proposed expert testimony of Sandra Henderson with respect to lost profits. Apparently anticipating the possibility that the court would grant the Daubert motion as to Ms. Henderson's proposed lost profits testimony, the defendants' motion in limine, filed on Sept. 20, 2011, sought, among other things, to foreclose the presentation of testimony from Mr. Myklatun on the same subject. *See*, doc. no. 215, at 17 - 20. A hearing was held on that motion on October 5, 2011. Point no. 9 of the defendants' motion was denied, except as to Mr. Myklatun's proposed testimony as to lost profits. That aspect of the motion was taken under advisement. The parties were permitted to file supplemental briefs, addressing issues under F.R.Evid 701 and 702, as well as issues of disclosure, surprise, prejudice and related matters. Those briefs have been filed and carefully considered.

The court's consideration of the admissibility of Mr. Myklatun's testimony as to lost profits is also informed by the court's colloquy with counsel following jury selection on October 11, 2011. As relevant here, the transcript of that hearing discloses the following colloquy:

> THE COURT: Mr. Keesling [counsel for plaintiffs], what is Mr. Myklatun's lost-profits number and when was it disclosed?
>
> MR. KEESLING: Mr. Myklatun believes he could have sold a million gallons of this product, Your Honor. He believes that the price that he could have set it would have been at a $25 profit margin; in other words, buy it for 25, sell it for 50. He also has, and it has been disclosed through discovery process, other potential contacts where he priced as high as $200. If we were to say all were priced at $200, then it would be a $175 profit margin at a million gallons. If it were all at a $25 profit margin, buying at 25, selling at 50, then it would be $25 profit per one million gallons sold. That is at a minimum on the sales aspect of what Mr. Myklatun anticipates and certainly what is included in e-mails and certainly has been provided through the course of discovery and was a

3

fundamental building block for Ms. Henderson's opinions in this case from which he provided to her, which was, in fact, disclosed during the course of this process to the defendants.

THE COURT: So we're going to hear testimony about a gross margin of $25 million or more?

MR. KEESLING: That's correct.

THE COURT: Okay. Has his analysis leading to a net profit number been disclosed?

MR. KEESLING: Your Honor, I am committed to the fact that it has been disclosed through the course of Ms. Henderson's report to these defendants and through the course of any questions that they've asked to him specifically. There's just -- I can say it again, but it's just the same thing. I'm going to continue to repeat myself. He has told these defendants what he believed he could do and what prices he believed he could do it at.

THE COURT: Okay. *What he thought what his unit sales might be is one thing, what his price per unit is another thing. His profit per unit is another thing. That is far from the number that he's entitled to ask the jury for. He has got to come down to a lost net profit number that takes into account all the slips from cup to lip between gross margin and net profit. And has that analysis been disclosed?*

MR. KEESLING: *We believe it has in the business plan which was provided by Mr. Myklatun through the course of discovery* of which it specifically addresses that he believes and projects that he can -- he can sell a million gallons of these products, Your Honor. And he -- in the business plan that has been provided to these defendants, and, in fact, was provided as part of Ms. Henderson's report, he says he could sell this at a price of $50 per gallon. In addition, there is this research council contract that Mr. Myklatun had been working on, wherein -- and that material has been disclosed to the defendants, Your Honor.

*  *  *  *

THE COURT: What is Mr. Myklatun's -- or what, if any, net profit number has been provided to the defendants, assuming the 25 --

4

assuming a gross margin $25 a gallon, a million gallons, what, if any, net profit number has been provided?

MR. KEESLING: It is built into the number Mr. Myklatun is providing, because he's buying -- he's buying for 25 and selling it for 50.

THE COURT: Right.

MR. KEESLING: So if he says, I can sell a million gallons at a $25 profit per gallon, that's $25 million, that is the net number to Mr. Myklatun, minus some additional expenses, which would be very small.

Now, he has provided salary numbers as to what he was paying himself during the course of that and he has provided testing information.

THE COURT: *So I take it your answer, basically, to my question is none; no net profit number has been provided by Mr. Myklatun.*

MR. KEESLING: That is not my answer. *If he tells you 25 million on a million gallons, that's his net profit.*

THE COURT: Okay. Thank you.[2]

Oct. 11, 2011 tr. at 74 - 80 (emphasis added).

Mr. Myklatun's approach to calculating his lost profits was not disclosed in his deposition. He would go no further than to say that he had read Ms. Henderson's opinion as to lost profits, he endorsed it, and he is not presenting a different number or a different calculation. Myklatun depo., at 196. Plaintiffs now maintain that their calculation would be "significantly different" from Ms. Henderson's. Oct. 11, 2011 tr. at 65, 66.

---

[2] At an earlier point in the hearing, plaintiffs' counsel was asked specifically whether Mr. Myklatun's proposed analytical approach to lost profits had been provided to the defendants. Oct. 11, 2011 tr. at 71. The candid response from plaintiffs' counsel was: "What I'm – what I won't accept, I guess, in terms of the question you're asking me is that there's an analytical approach. I think that overstates, Your Honor, what Mr. Myklatun is doing in this case." *Id.*

Mr. Myklatun's lost profits "computation" (*see*, Rule 26(a)(1)(A)(iii)) was not disclosed in any meaningful way by way of his initial disclosures or in any supplemental disclosures. Doc. no. 261, ex. 2. On the subject of damages, his answers to interrogatories deferred to "an expert to be named at a later time." Doc. no. 261, ex. 3, p. 9. Mr. Myklatun's calculation was not provided by way of any expert report he prepared (he has prepared none), and, as has been seen, was not foreshadowed by Ms. Henderson's report. The business plan referred to by plaintiffs' counsel at the October 11 hearing was prepared in 2005 by Sigmund Festoy.[3] It is not based on historical data – and in fact was not borne out by history.

If Mr. Myklatun's lost profits calculation is as simple as was suggested by his counsel at the October 11 hearing, it is inadmissible. Lost *net* profit, not gross margin, is the measure of lost profits. Florafax Int'l Inc. V. GTE Market Resources, Inc., 933 P.2d 282, 289 (Okla. 1997); Oklahoma Natural Gas Corp. v. Municipal Gas Co. of Muskogee, 113 F.2d 308 (10th Cir. 1940). But antecedent to the substantive problem is the fact that, as discussed above, there has been no meaningful or timely disclosure of any approach to lost profits that Mr. Myklatun would offer to the jury that has been selected to try this case. Applying the four-factor test articulated in Woodworker's Supply, Inc. v. Principal Mut. Ins. Co., 170 F.3d 985, 993 (10th Cir., 1999), the court quite readily concludes that it would be prejudicial to the defendants to require them to defend against a lost profits calculation that has not been disclosed in any way – or at any time – that would permit the testing and marshaling of defenses, both at the pretrial stage and for trial purposes, that would inevitably accompany a claim for lost profits that starts at $25 million and goes up from there to some undetermined

---

[3] "I had a man or a company doing a business plan for me." Myklatun depo. at 10, ex. 1 to doc. no. 261.

number.[4]  There is no opportunity for cure of the prejudice.  Discovery has closed, the motion deadline has passed, and the jury has been selected.  As for disruption of the trial, the trial of this case simply could not proceed if Mr. Myklatun were permitted to weigh in, at this point, with his own calculation of his lost profits.  These three Woodworker's Supply factors clearly weigh in favor of the defendants.  The fourth – bad faith or willfulness – does not.  The court rejects the defendants' suggestion, doc. no. 261, at 11, that Mr. Myklatun has acted in bad faith.  His disclaimers of any intent to expound on lost profits were understandable when made; they became improvident only when viewed in light of subsequent events.

      The court concludes, on balance, that fair application of the Woodworker's Supply factors precludes admission of Mr. Myklatun's proposed testimony as to lost profits.  This conclusion, and the analysis upon which it rests, makes it unnecessary to determine whether Mr. Myklatun's proposed testimony as to lost profits would be inadmissible for failure to meet the criteria for admission of lay opinion testimony under F.R.Evid. 701.[5]  The materials before the court leave the court highly uncertain as to whether the context in which Mr. Myklatun would offer his lost profits testimony more closely matches the situation presented in Nanodetex Corp. v. Defiant Technologies, 349 Fed. Appx. 312, 2009 WL 3303709 (10th Cir. 2009), as urged by plaintiffs, or in LifeWise Master Funding v. Telebank, 374 F.3d 917, 921 - 23 (10th Cir. 2004), as urged by defendants.  The court would need the benefit of voir dire examination of Mr. Myklatun outside of the hearing of the jury before deciding

---

[4] See note 1, above.

[5] Plaintiffs do not argue for admission of Mr. Myklatun's lost profits testimony under Rule 702. *See*, doc. no. 256, at 2 - 6.

whether his opinion testimony would qualify under Rule 701. However, in light of the conclusions reached above, that is not necessary.

Dated October 17, 2011.

09-0770p058.wpd

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE